HUBERT RUTLAND and RUTH RUTLAND, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rutland v. Commissioner
Docket No. 6438-74.
United States Tax Court
T.C. Memo 1977-8; 1977 Tax Ct. Memo LEXIS 430; 36 T.C.M. (CCH) 40; T.C.M. (RIA) 770008; January 17, 1977, Filed Michel G. Emmanuel,Michael D. Annis and Joseph D. Edwards, for the petitioners. Donald W. Williamson, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent *433 determined deficiencies in petitioners' Federal income tax for the taxable years ending June 30, 1968 and 1969 in the amounts of $45,497.07 and $67,650.10, respectively, and additions to tax under section 6653(a), I.R.C. 1954[1] of $2,274.85 and $3,382.51, respectively. [2]
Some of the issues raised by the pleadings have been disposed of by agreement of the parties. The issues remaining for decision are: (1) Whether a transaction whereby petitioners acquired a building and cash and International Minerals and Chemical Corporation acquired land formerly owned by petitioners constitutes in part an exchange of like kind properties within the meaning of section 1031; (2) whether, under a contract for sale of fruit by petitioners, amounts available for petitioners to draw by agreeing to pay interest in excess of the prime rate were constructively received in their taxable year ended June 30, 1969, even though *434 the amounts were not drawn; (3) whether the fair market value of office space which petitioners furnished rent-free to a symphony society and a credit counseling service during their fiscal year ended June 30, 1969, pursuant to an unwritten agreement, is deductible as a charitable contribution under section 170. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Hubert Rutland and Ruth Rutland were residents of St. Petersburg, Florida at the time of the filing of their petition in this case. Petitioners filed joint Federal income tax returns for the taxable years ended June 30, 1968 and 1969, with the District Director of Internal Revenue for the District of Florida. Mr. Rutland is a well-known St. Petersburg businessman. During the years here in issue he was controlling shareholder, president and chairman of the board of directors of the St. Petersburg Bank and Trust Company, a Florida banking corporation. Mrs. Rutland, petitioners' daughter and their son-in-law, Robert N. Bussey, were also on the board of directors of the bank during the years here in issue. Mrs. Rutland also held the position of vice president of the bank. *435 Petitioners owned approximately 28,560 acres of land situated in Manatee County, Florida. Officials of International Minerals and Chemical Corporation (IMC) believed this land contained commercially recoverable deposits of phosphate rock. On May 4, 1965, petitioners entered into a "Lease and Agreement" with IMC which, in part, gave IMC the right to purchase 2,500 acres of the Manatee County land for $500 per acre. The agreement was thereafter supplemented and amended on March 31, 1966, and July 7, 1967. The early drafts of the "Lease and Agreement" provided for an exchange of properties if desired by Mr. Rutland. Section 2 of Article IV of the third early draft provided as follows: The owners [the Rutlands] shall convey such property to IMC or its nominee by general warranty deed by payment of the purchase price. The purchase price for such property shall be $500.00 per acre and the owners shall have the right to select either of the following plans for payment: 1. Cash upon closing; 2. Other terms which may be acceptable to owners and IMC; 3. An exchange for real property to be designated by owners which may be available for purchase by IMC at a price not exceeding *436 the purchase price of the property being purchased hereunder, with the additional costs of the transfer and exchange to be borne by owners and with no obligation by way of warranty of the title to the selected property on the part of IMC in such exchange; any additional balance due on the purchase price of the property being purchased hereunder to be paid in cash at closing, or 4. Any combination of the above plans acceptable to both owners and IMC. The fourth, fifth and sixth drafts of the agreement contained only items 1 and 2 above. The seventh and final draft provided only that "[The] purchase price for the property shall be $500.00 per acre," the other language being eliminated because the "Lease and Agreement" was to be submitted to the Internal Revenue Service for a ruling as to whether the disposition of the Manatee County land under the agreement would be considered as a sale of a capital asset. There, however, was an oral agreement between Mr. Rutland and IMC that IMC would cooperate with Mr. Rutland in effecting an exchange of third-party property that Rutland might like IMC to acquire and convey to him in full or partial consideration for his conveyance to IMC *437 of 2,500 acres of Manatee County land. On June 3, 1965, counsel for IMC submitted to the Internal Revenue Service, Washington, D.C., on behalf of petitioners, a request for a ruling that the disposition of the Manatee County land under the "Lease and Agreement" dated as of May 4, 1965, would be considered as a sale of a capital asset. No mention of an exchange was made in the ruling request. [3]
Mr. Rutland also owned a store and office building on Fourth Street and Central Avenue in St. Petersburg, Florida, known as the Rutland Building, which is a portion of a building originally known as the Snell Building. The other portion of the building was occupied by Walgreen Drug Company. The building was known as the Walgreen Building. The Walgreen Building was beneficially owned by A. H. Greenfield of Chicago, Illinois, with the title to the building *438 being held in the name of his daughter and nominee, Cecelia Taman, also of Chicago. Mr. Greenfield desired to sell the Walgreen Building property and engaged an attorney, Leonard Cooperman, to assist him in this regard. In February 1967, Mr. Greenfield approached Mr. Rutland about buying the property for $350,000, but Mr. Rutland declined to acquire the property. Subsequently, Mr. Cooperman contacted Mr. Rutland, who expressed a willingness to acquire the property as part of a transaction between Mr. Rutland and IMC. Mr. Greenfield, through Mr. Cooperman, orally agreed with Mr. Rutland directly, or with Mr. Rutland through his attorney, Mr. Bussey, on a purchase price of $300,000 for the Walgreen property. Neither IMC nor its representatives ever negotiated with Mrs. Taman, Mr. Greenfield or Mr. Cooperman with respect to the proposed acquisition of the Walgreen Building property. The terms of this transaction were negotiated by Mr. Rutland or his attorney. However, Mr. Cooperman was informed that IMC would be the buyer and Mr. Cooperman further advised Mr. Greenfield that there was no reason to believe that Mr. Rutland would acquire the property other than from IMC. Therefore, *439 it was clear to Mr. Cooperman early in the negotiations for purchase of the Walgreen Building that Mr. Rutland was interested in the Walgreen Building only if the transfer of land to IMC was to be consummated. Whether the acquisition was in the name of IMC or Mr. Rutland made no difference to Mr. Greenfield, as long as he received the agreed upon selling price. Mr. Cooperman drafted a sales agreement which provided, in part, that the Walgreen Building property would be conveyed by Mrs. Taman, joined by her husband, to the St. Petersburg Bank, as trustee. The agreement was executed by the Tamans and forwarded to Mr. Bussey, but the bank never signed the contract. This sales agreement was drafted after Mr. Rutland had requested IMC to acquire the Walgreen Building to be used as a partial exchange for the Manatee County land. Mr. Bussey had informed Mr. Cooperman that the exchange was to be made. In a letter dated June 23, 1967, Mr. Bussey advised IMC's attorney, Mr. Butler, of the legal description of the Walgreen Building. On June 28, 1967, Mr. Butler forwarded to Mr. Bussey copies of the various documents pertaining to the closing of the transfer of the Manatee County land *440 to IMC and the purchase of the Walgreen property, including a draft of a closing memorandum. Mr. Butler advised Mr. Bussey that it was assumed that the Tamans would pay the documentary stamps with respect to the conveyance of the Walgreen property and that therefore such cost was not shown on the closing memorandum and, also, that the closing memorandum did not reflect any arrangement Mr. Bussey might have made with respect to a proration of taxes, insurance, or other matters in connection with the acquisition of the building. All of the details necessary to the proposed acquisition of the Walgreen Building property were handled by Mr. Bussey. He checked the title to the property and had West Coast Title Company recertify the abstract. After an examination of the title he advised Mr. Rutland of his findings through an opinion letter. He also had correspondence with Equitable Life Assurance Society of the United States with respect to the abstract on the property and also requested information concerning the amount and payoff provisions of the mortgage on the Walgreen Building held by Equitable. July 7, 1967, was finally set as the closing date for the transactions concerning *441 the Walgreen Building property and Manatee County property. Closing had been delayed because of title problems with respect to the Manatee County land to be conveyed by Mr. Rutland to IMC. The documents to be executed by IMC had been forwarded for that purpose by Mr. Butler to IMC's Chicago attorney, E. W. Saunders, on June 27, 1967. The executed documents were delivered at closing. The Tamans had executed a deed on June 29, 1967, to convey the Walgreen Building property to the St. Petersburg Bank, a trustee. The deed executed by the Tamans conveying the property to the St. Petersburg Bank, as trustee, was delivered at the closing on July 7, 1967. [4] However, the closing on the transfer of the building did not go exactly as expected. It had been Mr. Cooperman's understanding that the 1967 real estate taxes were to be assumed by the buyer, but a disagreement in this respect arose with Mr. Bussey, with the matter being resolved by Mr. Greenfield agreeing to prorate the real estate taxes on the building for 1967 on the basis of the 1966 taxes. *442 The conveyance of the Walgreen Building property by the Tamans to the St. Petersburg Bank, as trustee, was subject to, among other things, a mortgage held by Equitable Life with a balance as of May 1, 1967, of $134,179.98. In connection with the closing, IMC drew two checks totaling $300,000 with one payable to the Tamans in the amount of $158,322.14 and the other payable to the St. Petersburg Bank in the amount of $141,667.86 (this is so stipulated, even though there is obviously a $10 error). At the closing Mr. Greenfield refused to accept the check in the amount of $158,322.14 drawn on an account maintained by IMC. Mr. Rutland assured Mr. Greenfield of the worth of the check and caused an endorsement to be placed on the check by the bank, "Collection Guaranteed." [5] The check payable to the St. Petersburg Bank in the amount of $141,667.86 included, among other things, the balance due on the mortgage held by Equitable Life plus accrued interest. The mortgage, however, was not paid off and the principal balance of $134,179.98, together with accrued interest, was distributed by the St. Petersburg Bank to Mr. Rutland some time after July 7, 1967. *443 The St. Petersburg Bank took title to the Walgreen Building property under a Trust Agreement dated July 5, 1967, executed on behalf of the St. Petersburg Bank and IMC. The instrument reflected IMC as 100 percent beneficial owner. This document had been prepared by Mr. Butler, IMC's local attorney. An instrument entitled "Assignment of Beneficial Interest" was then executed on behalf of IMC on July 5, 1967, reflecting an assignment of its beneficial interest in the trust to Mr. Rutland and this document was delivered to Mr. Rutland at closing. [6]
On the same day the purchase of the Walgreen Building property was closed, July 7, 1967, IMC acquired, through the St. Petersburg Bank, as trustee, 2,500 acres of the Manatee County land from petitioners, pursuant to the terms of the prior executed "Lease and Agreement" for $500 per acre *444 or a total of $1,250,000. Those present at the closing transaction included Mr. Greenfield, Mr. Cooperman, Mr. Louis Taman, Mr. Saunders, Mr. Stringfellow, Mr. Butler, Mr. Rutland and Mr. Bussey. The Manatee County land was conveyed by the Rutlands by deeds dated June 29, 1967, and July 5, 1967, to the bank as trustee under a Trust Agreement executed on behalf of the bank reflecting Mr. Rutland as 100 percent beneficial owner. On July 5, 1967, the Rutlands executed an instrument assigning to IMC their beneficial interest in the trust to which the Manatee County land had been conveyed. This document was delivered at the closing on July 7, 1967. The Manatee County land conveyed by Mr. Rutland to the bank as trustee has continued to be so held by the bank. IMC had requested that the land be taken in the name of a nominee to avoid disclosure of its purchases of phosphate lands to its competitors. In its settlement with Mr. Rutland on the acquisition of the 2,500 acres of land in Manatee County, IMC deducted $300,000 from the $1,250,000 purchase price. Following various adjustments for different costs, IMC paid Mr. Rutland $1,022,500 cash upon closing of the transaction. This *445 amount included $950,000 balance on the purchase price, $67,500 interest and $5,000 to reimburse Mr. Rutland for abstract costs pertaining to the 2,500 acres of land. IMC paid none of the closing costs incurred with respect to the acquisition of the Walgreen Building property. All of these costs, including documentary stamps required in the transaction, were paid by Mr. Rutland in accordance with the understanding reflected in the early drafts of the "Lease and Agreement." On their joint return for the taxable year ended June 30, 1968, petitioners reported long-term capital gain of $1,064,745.14 from the sale of the land situated in Manatee County computed as follows: Sale of Land to IMC
Contract Price
$1,250,000.00
Allowance for Walgreen
Property taken in trade
300,000.00
$ 950,000.00
Balance of Mortgage on Walgreen
134,179.98
$1,084,179.98
Expenses
Legal
Deferred 6-30-67
$4,135.61
Bussey
5,757.06
Harrison
8,449.42
$18,342.09
Title Expense
6,092.75
Reimbursement
5,000.00
1,092.75
19,434.84
$1,064,745.14
During the taxable year ended June 30, 1969, Mr. Rutland also operated a farm. He raised cattle *446 for sale and also sold fruit. The cash basis of accounting was used for the farming operation. During the taxable year ended June 30, 1969, Mr. Rutland sold fruit to Ben Hill Griffin, Inc., a fruit processor, pursuant to a participation agreement entered into by the parties on August 14, 1968. This agreement was to cover the 1968-1969 fruit season. This agreement provided as follows: This is written as a participation agreement for the 1968-69 season between Ben Hill Griffin, Inc. of Frostproof, hereinafter referred to as the Processor and Mr. Hubert Rutland, hereinafter referred to as the Grower. * * *
The title to all fruit delivered under the terms of this agreement shall pass to Ben Hill Griffin, Inc. at the time of delivery to the processing outlet. Fruit received at our Frostproof processing plant will be tested in the customary manner by the State Inspection Service and your account will be credited with 100% of the amount of pounds of fruit solids as determined in these tests. Your fruit will be considered as part of our concentrate pools, according to the variety of fruit being delivered. Returns on these pools will be based on our sales realization from *447 frozen concentrate applicable to these pools. In addition, you will be credited with your proportionate share of our by-product revenues and your account will be charged for its pro rata share of our costs to process and market concentrate, in addition to a processing fee of $.09 per gallon, basis 45 degree brix on oranges, tangeloes and murcotts and $.10 per gallon, basis 40 degree brix on grapefruit. * * *
On fruit received at our fresh fruit packing house, your account will be credited with the number of packed boxes shipped as fresh fruit. Grower will participate in fresh fruit by variety and receive average returns by variety on a packed box basis. Your account will be charged for its pro rata share of our costs to process and market this fruit plus a processing fee of $.10 per standard 1 3/5 box. The eliminations will be participated as stated in the above paragraphs. Processor will deliver your fruit when practicable after fruit meets State and U.S.D.A. maturity tests, to its processing facilities and will charge Grower's account for all picking and hauling cost incurred. We will advance the funds necessary for picking and hauling at no interest which will be *448 charged to your account. Upon request by the Grower, Processor agrees to advance to the Grower on Wednesday of each week following the week of delivery, amounts equal to 70% of the Florida Canners report all price fruit average for the week of delivery less the picking and hauling costs according to the above agreement. Such advances shall be related to the variety of fruit being delivered and shall bear interest at the prime rate plus 1/2 of 1% per annum to August 15, 1969 on Early and Midseason oranges, murcotts, tangeloes, temples, and grapefruit and to December 15, 1969 on Valencia oranges. Processor agrees to make payments to Grower as its inventories are sold. If Grower has obtained maximum advances under this contract, then such payments as Processor makes will be credited to Grower's account and thereby stop interest charges. As soon as practicable after August 15, 1969, we will make an estimated final settlement on our Midseason orange, murcott, tangelo, temple, and grapefruit pools and we will make a final settlement on our Midseason orange, murcott, tangelo, temple, grapefruit, and Valencia pools as soon as practicable after December 15, 1969. Between August 11, 1968 and *449 February 11, 1970, Ben Hill Griffin, Inc. paid Mr. Rutland $282,247.17 under the agreement for his 1968-1969 fruit crop. Of this amount, $61,073.21 was actually received by Mr. Rutland prior to June 30, 1969, and the amount of $140,472.91 was available so that Mr. Rutland could have drawn upon such amount under the terms of the participation agreement prior to June 30, 1969, but Mr. Rutland did not do so. The amount of $61,073.21 actually received by Mr. Rutland during the taxable year ended June 30, 1969, was reported in farm income for that year. The amount of $140,472.91 was reported as part of Mr. Rutland's farm income for the taxable year ended June 30, 1970, the year of the final settlement between Mr. Rutland and Ben Hill Griffin, Inc., in August and December 1969, under the terms of the participation agreement. During their taxable year ended June 30, 1968, the Rutlands permitted the St. Petersburg Symphony Society, an organization described in section 170(c), to use, without charge, office space in a building owned by petitioners. The reasonable rental value of the office space furnished was $1,500. There was no written lease of the premises. Also during the *450 taxable year ended June 30, 1968, the Rutlands permitted the St. Petersburg Credit Counseling Service, Inc. to use, without charge, office space in a building owned by petitioners. The reasonable value of that office space was $1,100. There was no written lease of the premises. In the year ending June 30, 1968, the Credit Counseling Service had not applied for an exemption ruling from the Internal Revenue Service. Therefore, it was not listed in "Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954," IRS Publication No. 78. This organization was organized with the stated purpose of participating in the nationwide Consumer Credit Counseling Service Plan of the National Foundation for Consumer Credit, an organization which is included in Publication No. 78. On their joint income tax return for the taxable year ended June 30, 1968, petitioners deducted as a charitable contribution the respective fair rental values of the office space furnished to the Symphony Society and the Counseling Service. In his statutory notice of deficiency respondent made the following determinations with respect to the items here *451 in issue: (b) It is determined: (1) that you purchased the Walgreen Property for $300,000.00 and that no part of the acquisition of said property qualified as a nontaxable exchange under section 1031 of the Internal Revenue Code in connection with the sale of land to International Minerals Corporation; and (2) that you realized a long-term capital gain of $1,230,565.16 from the sale of 2,500 acres of land to International Minerals Corporation rather than $1,064,745.14 as reported. Accordingly, income for the tax year ended June 30, 1968 is increased by $82,910.01, computed as follows: Sale price of land
$1,250,000.00
Basis in land
$ None
Selling expense per return
19,434.84
19,434.84
Long-term gain realized
$1,230,565.16
Gain realized per return
1,064,745.14
Additional long-term gain realized
$ 165,820.02
Less: Section 1202 deduction
82,910.01
Additional taxable gain - increase
in income
$ 82,910.01
(c) Since the acquisition of the Walgreen Property has been eliminated in the computation of gain realized from the sale of land in adjustment (b) above, your basis in such property is increased to $300,000.00. *452 Accordingly, income for the tax years ended June 30, 1968 and June 30, 1969 is decreased by $2,036.94 and $2,119.35, respectively, representing allowance of additional depreciation on the Walgreen building as computed in Exhibit A. * * *
(e) * * * With respect to farm income for the tax year ended June 30, 1969, it is determined: * * * (2) that you constructively received income of $140,472.91 from citrus sales to Ben Hill Griffin, Inc. which was not reported on the return; * * * (f) It is determined that the deductions of $1,500.00 and $1,100.00 claimed for office space donated to St. Petersburg Symphony Society and St. Petersburg Credit Counseling Service, Inc., respectively, are not allowable under section 170 of the Internal Revenue Code because the permission to use and occupy property did not result in a legally enforceable conveyance of a present interest and because St. Petersburg Credit Counseling Service, Inc. is not an organization to which contributions are allowable deductions under section 170 of the Code. Accordingly, income for the tax year ended June 30, 1968 is increased by $2,600.00 ($1,500.00 + $1,100.00). Petitioners by an *453 amended petition alleged that the amount of $61,073.21 actually received during the taxable year ended June 30, 1969, and reported on their joint Federal income tax return for that taxable year was not properly includable in income for that year because the sums received pursuant to the fruit participation agreement "constituted a bona fide loan and were not income to petitioners for that fiscal year." On brief, petitioners conceded this issue, stating that the evidence did not show that the $61,073.21 did not constitute payments for inventories sold. OPINION Section 1031(a) provides that no gain or loss shall be recognized if property held for productive use in a trade or business or for investment is exchanged solely for property of a like kind to be held either for productive use in a trade or business or for investment. Section 1031(b) provides that when money is received in an exchange in addition to property of a like kind, the gain, if any, is to be recognized in an amount not in excess of the sum of money received. [7]
*454 It is petitioners' position that the acquisition of the Walgreen Building on July 7, 1967, by delivery of the "Assignment of Beneficial Interest" from IMC was in exchange for the land situated in Manatee County so that petitioners are entitled to partial nonrecognition of gain under section 1031. It is respondent's position that the transaction consummated on July 7, 1967, did not meet the requirements of section 1031, with the result that the entire amount of gain realized upon disposition of the land situated in Manatee County is to be recognized pursuant to the general rule of section 1002. The parties agree that the unimproved ranch land situated in Manatee County held by the Rutlands and the improved city realty (Walgreen Building) involved here are "like kind" property within the meaning of section 1031. E.R. Braley,14 B.T.A. 1153 (1929). Respondent argues that the transaction should be viewed for tax purposes as a sale of the land situated in Manatee County with an immediate or simultaneous reinvestment of a portion of the proceeds received in acquiring the Walgreen Building. Thus, under respondent's view, Mr. Rutland was the actual purchaser of *455 the Walgreen Building, with IMC constituting a mere "straw" or "conduit" in the acquisition. Respondent relies on, among others, the cases of Carlton v. United States, 385 F.2d 238, 241 (5th Cir. 1967); Coastal Terminals, Inc. v. United States, 320 F.2d 333, 337 (4th Cir. 1963); and Trenton Cotton Oil Co. v. Commissioner, 147 F.2d 33, 36 (6th Cir. 1945), reversing and remanding a Memorandum Opinion of this Court. [8]
*456 In reaching his conclusion, respondent points to a number of facts. Respondent points out that all negotiations with respect to the acquisition of the Walgreen Building were carried out by Mr. Rutland or his son-in-law and attorney, Mr. Bussey. These negotiations were with respect to the purchase price, the terms of the transaction, the manner in which title was to be conveyed and when the transaction was to be closed. Mr. Rutland also agreed to pay the closing costs and was to undertake the title search. Neither IMC nor any of its representatives ever negotiated for the acquisition of the building, but assumed a completely passive role. IMC never had any agreement, oral or written, relative to the acquisition of the Walgreen Building. It is respondent's contention that an arrangement for suitable replacement property does not meet the requirements of section 1031 when the substance of the transaction is examined. Respondent asserts that for the substance of the transactions to be a purchase of the Walgreen Building by IMC, that corporation must have entered the negotiations once the replacement property had been selected. Respondent has also asserted there was no contractual *457 interdependency between petitioners' disposition of the 2,500 acres of land to IMC and the acquisition of the Walgreen Building. Respondent argues that the two transactions were not mutually dependent since petitioners had a binding agreement which gave IMC the option to acquire the Manatee County land without any legally binding contractual responsibility on the part of IMC to purchase like kind property and exchange it as part of the transaction. Respondent also argues that IMC did not assume any of the burdens and obligations of ownership with respect to the Walgreen Building. He states on brief that "it is doubtful that [IMC], in form or in substance, acquired actual title to the Walgreen property since the property was conveyed directly to St. Petersburg Bank as trustee. Failure to vest legal title to the property in IMC would be a failure to perfect the transaction as an exchange since the assignment to Rutland of IMC's beneficial interest under the trust agreement with St. Petersburg Bank was not enough." Respondent asserts that the only realistic conclusion that can be drawn from the entire record is that the bank was a mere paper trustee acting at the behest and direction *458 of its controlling shareholder, Mr. Rutland. [9]
*459 We have carefully examined the facts of this case in light of respondent's argument and it is our conclusion that the Walgreen property was received by petitioners in a transaction that satisfies the requirements of section 1031 so that petitioners are entitled to partial nonrecognition of the gain upon the disposition of the land situated in Manatee County. It is clear from the evidence that the transactions here involved were constructed for tax purposes. However, this fact alone does not cause the substance of the transaction to differ from its form as respondent contends. The focus of section 1031 has been on the requirement that title to the parcel transferred by the taxpayer be transferred in consideration for, property received. Leslie Q. Coupe,52 T.C. 394, 405 (1969). Here that requirement has been met. The record shows that the documents prepared and agreements reached by the parties were not fictitious, but created legal obligations among the parties. Petitioners did not actually purchase the Walgreen Building.Nor was IMC a "conduit" or "straw" for the acquisition of the property. The Rutlands never entered into a contract to purchase the *460 Walgreen Building. It is clear that Mr. Cooperman, Mr. Greenfield's attorney, understood that the Walgreen Building was not a desirable piece of real estate to the Rutlands unless the transaction with IMC was completed and an exchange could be arranged with IMC. On brief respondent points out that Mr. Rutland and IMC had entered into an option agreement which provided for a cash payment. Earlier drafts of the option agreement had included alternative means of payment such as exchange of suitable properties, but these provisions had been removed before the execution of the agreement. Although the final agreement did not so provide, representatives for Mr. Rutland and IMC had orally agreed to work out an acceptable exchange arrangement in which IMC was willing to acquire suitable land for the exchange. Respondent argues that there was no contractual interdependency between the transfer of the land to IMC from the Rutlands and the purchase of the Walgreen Building by IMC because IMC already had a binding option to purchase land held by Mr. Rutland. [10] However, we noted in Leslie Q. Coupe, supra, at 405: It is now well settled that when a taxpayer who is holding *461 property for productive use in a trade or business enters into an agreement to sell the property for cash, but before there is substantial implementation of the transaction, arranges to exchange the property for other property of like kind, he receives the nonrecognition benefits of section 1031. Coastal Terminals, Inc. v. United States, 320 F.2d 333 (C.A. 4, 1963); James Alderson,38 T.C. 215 (1962), reversed on other grounds 317 F.2d 790 (C.A. 9, 1963); Carlton v. United States, 385 F.2d 238 (C.A. 5, 1967). * * * [11]
*462 Respondent asserts that IMC never assumed any of the burdens and obligation of ownership relative to the Walgreen Building. Respondent's assertion is correct only to the extent that IMC held beneficial interest only for as long as the closing transaction required. However, IMC did provide the consideration for the purchase of the property and assumed the risks of ownership for a short period of time although the title was conveyed to the bank as trustee. Respondent has also argued that the bank was acting as a mere paper trustee for its controlling shareholder, Mr. Rutland. The documentary evidence shows that the bank was acting in a fiduciary capacity to IMC in taking title to the Walgreen Building and there is no evidence to rebut this documentary evidence. On the basis of the facts here present we conclude that the Walgreen Building was exchanged for the Manatee County land and the nonrecognition of gain provisions of section 1031 are applicable to the transaction. The second issue presented is whether respondent properly included in petitioners' taxable income for their fiscal year ended June 30, 1969, the amount of $140,472.91. The facts with respect to this issue *463 were fully stipulated. Petitioners' right to receive the $140,472.91 was provided for in the participation agreement with Ben Hill Griffin, Inc. This agreement, which covered petitioners' 1968-1969 fruit crop, provided that title to all fruit delivered to Ben Hill Griffin, Inc. (the processor) passed to the processor at the time of delivery. It provided that payment for the fruit would be made to petitioners as the processor's inventories were sold. The processor was to advance funds necessary for picking and hauling and the grower (petitioners) was to be paid for the fruit on the basis of receipts by the processor from the sale of the products produced from all fruit of the class into which petitioners' fruit was placed. Final settlement with respect to certain types of fruit was to be made as soon as practicable after August 15, 1969, and with respect to other types as soon as practicable after December 15, 1969. The contract further provided: Upon request by the Grower, Processor agrees to advance to the Grower on Wednesday of each week following the week of delivery, amounts equal to 70% of the Florida Canners report all price fruit average for the week of delivery less *464 the picking and hauling costs according to the above agreement. Such advances shall be related to the variety of fruit being delivered and shall bear interest at the prime rate plus 1/2 of 1% per annum * * * The agreement provided that where the grower had obtained the maximum advances under the contract, the payments made as inventories were sold would be credited to the grower's account and thereby stop interest charges. The parties specifically stipulated that "the amount of $140,472.19 [sic] was available so that Rutland could have drawn upon such amount under the terms of the participation agreement prior to June 30, 1969, but Rutland did not do so." However, the parties present their arguments on the basis of whether the $140,472.91 would have been a loan rather than income had Mr. Rutland drawn the amount. Respondent specifically relies on his Revenue Ruling 69-359, 1969-1 C.B. 140. This revenue ruling deals with a farmer who "receives part of the price at the time of harvest and the remainder when the fruit is resold by the purchaser." In this ruling respondent concludes that any amount "received by a farmer prior to resale of the fruit by the purchaser *465 merely represents a portion of the sale price and is not a loan. See Joseph Binenstock v. Commissioner, 321 F.2d 598 (1963)." Still following the approach of treating the $140,472.91 as having been actually received by petitioners in their fiscal year 1969, respondent relies on Commissioner v. Makransky, 321 F.2d 598 (3d Cir. 1963), the same case cited under a different name in his revenue ruling. Petitioners' position is that even if the amount had been received by them it would have been a loan. They rely on United States v. Ivey, 414 F.2d 199 (5th Cir. 1969), and cases of similar import. The Ivey case involved advances received by a cotton farmer under a contract with his broker which permitted him to receive advances at the time his cotton was delivered to the broker. The advances were to be satisfied out of the sales proceeds of the farmer's cotton when the broker sold the cotton as the farmer's agent. In this case, title to petitioners' fruit passed to the processor when the fruit was delivered to the processor. Under the contract, had petitioners taken the advances which were available to them, because of the limited *466 amounts available as advances it would have been unlikely that any repayment of an advance would be made other than by crediting proceeds of the sale of petitioners' fruit against the advances. Under the facts actually here present, the question presented is different from that which would be presented had petitioners actually drawn the available advances. Since petitioners did not request or draw the $140,472.91 available advances, the issue here is whether this amount was constructively received by petitioners. As we pointed out in Florence H. Griffith,35 T.C. 882, 892 (1961), the doctrine of constructive receipt will be sparingly applied and should be invoked only in a clear case. In Oliver G.Willits,50 T.C. 602, 612-613 (1968), we outlined the theory of constructive receipt as follows: The theory of constructive receipt is one of long standing, and regulations embodying that concept have had judicial approval as far back as Loose v. United States,74 F.2d 147 (C.A. 8, 1934). Thus, although income is not actually reduced to a taxpayer's possession, it is treated as constructively received by him in the taxable year *467 when it is set apart for him, or otherwise made available to him without substantial limitation or restriction. Stated differently, a "taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it." Hamilton Nat. Bank of Chattanooga, Administrator,29 B.T.A. 63, 67. Cf. Williams v. United States,219 F.2d 523 (C.A. 5); Everett Pozzi,49 T.C. 119; Joseph Frank,22 T.C. 945, 952-953, affirmed 226 F.2d 600 (C.A. 6); RichardR. Deupree,1 T.C. 113; William Holden,6 B.T.A. 605; sec. 1.451-2, Income Tax Regs. On the other hand, "a bona fide contract providing for deferred payments * * * [will] be given effect notwithstanding that the obligor might have been willing to contract to make such payments at an earlier time." Ray S. Robinson,44 T.C. 20, 36. Cf. Commissionerv. Oates,207 F.2d 711 (C.A. 7), affirming 18 T.C. 570, nonacq. 1952-2 C.B. 5 withdrawn and acq. substituted 1960-1 C.B. 5; Drysdale v. Commissioner,277 F. 2d 413 *468 (C.A. 6), reversing 32 T.C. 378; Commissioner v. Olmsted Incorporated Life Agency,304 F.2d 16 (C.A. 8), affirming 35 T.C. 429; Kay Kimbell,41 B.T.A. 940, acq. 1940-2 C.B. 5. Bearing in mind the theory of constructive receipt as set forth above, we consider the issue here to be whether the $140,472.91 which was available for petitioners to draw upon, but which was not drawn upon, was available to petitioners "without substantial limitation or restriction" so that their failure to draw the amount might be viewed as deliberately turning their backs upon income. Clearly the contract here provided payment to petitioner for his fruit after the processor's inventories were sold. Had petitioners declined to take payments as the processor sold the inventories and they became entitled to payment, they obviously would have constructively received the income represented by the payments they refused. [12]
*469 However, under the stipulated facts here we consider it clear that the $140,472.91 was the amount on which petitioners could draw and become obligated, if they did so draw, to pay interest at the prime rate plus one-half of one percent. In our view the stipulated facts make it clear that none of the $140,472.91 constituted payment for petitioners' fruit as the processor's inventories were sold. Our question therefore becomes the narrow one of whether a requirement that interest on a "draw" be paid at one-half of one percent above the prime rate is a sufficient restriction upon receipt of the payment to cause petitioners not to have constructively received the amount available for them to draw. Although we consider the question to be a close one, we conclude that the restriction requiring payment of interest in excess of the prime rate to be a sufficient restriction on receipt of the payment to cause the $140,472.91 not to have been constructively received by petitioners.In General Baking Company,48 T.C. 201 (1967), we held that the taxpayer had not constructively received amounts deposited with the local court upon condemnation of its property where, under *470 state law, it would have given up certain appeal rights had it taken the funds. In that case we made reference, at 212, to United States v. Steck,295 F.2d 682 (10th Cir. 1961), stating that there was no constructive receipt by the taxpayer "where the taxpayer, by accepting the deposit, would have had to give up his claim for interest on the amount due him * * *." In our view a true distinction cannot be drawn between a situation of a taxpayer who must surrender his right to interest in order to take an amount available to him and a taxpayer who must pay substantial interest in order to take that amount. The situation in the Steck case is sharply in contrast to that in Harry D. Aldridge,51 T.C. 475 (1968), in which we held that a taxpayer constructively received an amount set aside for him in a condemnation proceeding since possession of the property condemned had been taken, and under the governing state law the amount paid to the court could have been withdrawn by the taxpayer without any detriment except the possible payment of interest should, upon a final review, a higher court reduce the amount of his award. In explanation of our holding *471 we stated, at 479-480: But the obligation [to pay interest] was contingent upon an appeal being taken by the condemnor (which might not occur) [footnote omitted], would attach to only a portion and not all of the deposit, and represented no more than a normal payment for the use of money which a condemnee had put to work for his own benefit. [8]
In the instant case there was no contingency on the requirement that petitioners pay interest at one-half of one percent above the prime rate if they opted to draw the amounts available for them to draw. Little purpose would be served by a discussion of the numerous cases dealing with constructive receipt. Neither party has called to our attention nor have we found any case with facts sufficiently similar to those in the instant case to be controlling. A determination of whether the right to receive income is sufficiently unrestricted to warrant a conclusion that the amount has been constructively received is primarily a factual one *472 and differences in facts must be considered in making the determination. Oliver G. Willits,supra, at 613. One case discussed by the parties is Patterson v. Commissioner,510 F.2d 48 (9th Cir. 1975), reversing a Memorandum Opinion of this Court. We do not consider this case to be sufficiently comparable to the instant case to be controlling. That case involved a sale by the taxpayer of potatoes under a contract or growing agreement that permitted him to make withdrawals under certain circumstances. In explaining its reversal of our decision, the Circuit Court stated in the Patterson case, at 50: Among the Tax Court's findings of fact is the following: All petitioners needed to do to receive payment was to request inspection and payment in December 1969. In view of the clear requirement in the "Modification-Agreement" that the potatoes be insured by the Grower, with a loss payable clause in favor of the Company to reimburse it for all advances made to Patterson, coupled with the absence of any evidence showing a practice on the part of the company of waiving the requirement, we have a definite and firm conviction that this finding *473 constituted a mistake by the Tax Court. * * * The reversal was on the premise that the requirement that the taxpayer provide insurance for the benefit of the company in the amount of the advances was a sufficient restriction on the taxpayer's right of receipt of the income to require the conclusion that the taxpayer had not constructively received available advances which he had not chosen to withdraw. Regardless of whether the requirement of furnishing insurance should be considered a substantial restriction on receipt of income it is, as was the requirement in the General Baking case that an appeal from the condemnation award not be taken, a different type of requirement from the requirement of the interest payment in the instant case. In our view we should not effectively say that an individual with ample funds should be required to draw amounts available if he pays interest at one-half of one percent above the prime rate. Perhaps the individual's funds could not be invested so as to draw even interest at the prime rate.To say that petitioners turned their backs on income unrestrictedly available to them would in effect be stating that they were required to take available *474 funds at an interest rate above the prime rate regardless of their need for the funds. We conclude on the basis of the record here that petitioners are not required to include the $140,472.91 in their income for their fiscal year ended June 30, 1969. The final issue concerns the deductibility of the fair rental value of space in an office building furnished by petitioners rent-free to the St. Petersburg Symphony Society and the St. Petersburg Credit Counseling Service, Inc. During the taxable year ended June 30, 1968, petitioners permitted the St. Petersburg Symphony Society and the St. Petersburg Credit Counseling Service, Inc. to use, without charge, office space in a building owned by them. There was no written lease executed with respect to the use of these offices. Section 170(a)[13] allows a deduction for any charitable contribution made within the taxable year and section 170(c) defines "charitable contribution" as a contribution or gift "to or for the use of" an organization described in section 170(c)(2). [14]
*475 It is petitioners' position that they are entitled to a charitable contribution deduction for the fair rental value of the office space furnished to the organizations in the amounts of $1,500 for the St. Petersburg Symphony Society and $1,100 for the Credit Counseling Service. The parties have stipulated that these amounts represent the fair market value of the space furnished. It is respondent's position that petitioners did no more than grant to these organizations permission to use and occupy office space in their building which respondent argues does not represent "payment" to or for the use of the organization within the meaning of section 170(a). Respondent argues that the use of property permitted by petitioners is analagous to a contribution of services for which no charitable deduction is allowed. Respondent further argues that for petitioners to be entitled to a charitable contribution deduction for their allowing a charity the rent-free use of property, such use must have been permitted pursuant to a legally enforceable conveyance of a present interest under local law. [15]
It is clear *476 that "payment" can be in property other than money, with the charitable contribution deduction to be measured by the fair market value of the property at the time of the contribution. Sec. 170-1(c)(1), Income Tax Regs. It is equally clear that for the year in issue a charitable contribution deduction based on the value of rent-free use of property granted to a charitable organization is allowable if the charitable gift results in a conveyance of a present interest in property under local law. John G. Allen,57 T.C. 12, 13 (1971); Thriftimart, Inc., 59 T.C. 598, 615 (1973), remanded on other issues by order of December 10, 1975; Threlfall v. United States,302 F. Supp. 1114 (W.D. Wis. 1969). Fla. Stat. Ann. sec. 83.01[16] provides, in effect, that any oral lease of land creates a tenancy at will. The period of such lease is then determined by the period at which rent is payable.Neither party has cited us to a Florida case where the issue has been raised of whether the rent-free use of property by oral agreement creates a tenancy at will. However, the general rule in such a case is that a permissive occupation *477 for an indefinite period, without reservation of rent, is by implication a tenancy at will. [17] Therefore, we hold on the facts here present that petitioners, by permitting rent-free use of their property, made a completed gift of a present interest in property. *478 Respondent's attempt to draw an analogy to a contribution of services is without merit. Unlike a gift of services the gift of a leasehold interest vests exclusive control and possession of the property in the donee. Cf. Orr v. United States,343 F.2d 553 (5th Cir. 1965). The facts with respect to this issue were fully stipulated. Although the stipulation of facts agreed to by the parties states only that these organizations were permitted to use, without charge, office space in a building owned by the Rutlands and does not provide that exclusive use was granted for the period the respective charities occupied the office space, we consider it reasonable to so interpret the stipulation. Respondent has not contended otherwise. A further requirement for petitioners to be entitled to a charitable contribution deduction is that the contribution be to an organization described in section 170(c). The parties have stipulated that the St. Petersburg Symphony Society is an organization described in section 170(c). Thus, petitioners have fulfilled the requirements for a charitable contribution deduction with respect to the rent-free use of property allowed to the Symphony *479 Society. We hold petitioners are entitled to a charitable contribution deduction of the $1,500 amount stipulated to be the fair rental value of the premises occupied by the Symphony Society. However, the St. Petersburg Credit Counseling Service, Inc. has never received an exemption ruling from the Internal Revenue Service and has never been listed in Internal Revenue Service Publication 78, Cumulative List of Organizations Described in Section 170(c) of the Internal Revenue Code of 1954. The parties have submitted a copy of the bylaws of the organization and correspondence explaining to prospective users of the service the proposed function and purpose of the St. Petersburg Credit Counseling Service.Petitioners offered no evidence with respect to the actual operation of the Credit Counseling Service. Under section 170(c)(2)(B), for a taxpayer to be entitled to a charitable contribution deduction to a corporation that corporation must be "organized and operatedexclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;" [Emphasis supplied]. The burden of proof *480 is on petitioners to show that the St. Petersburg Credit Counseling Service was both organized and operated exclusively for the above-named purposes and this they have not done. Glenn E. Edgar,56 T.C. 717, 755 (1971); Isabel Peters,21 T.C. 55, 59 (1953). There is no evidence available in this record from which we can determine the nature of the actual activities of the Counseling Service. Therefore, there is no evidence to entitle petitioners to a deduction of the fair market value of the office space furnished to the Counseling Service.We sustain respondent's disallowance of the $1,100 claimed contribution for allowing the Counseling Service rent-free use of their property. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Respondent has conceded that petitioners are not liable for the additions to tax under section 6653(a)↩ for the taxable years ended June 30, 1968 and 1969.
3. The requested ruling was issued by the Internal Revenue Service to petitioners by letter dated September 30, 1965. Only the failure to have obtained such ruling by November 30, 1965, or the receipt of an unfavorable ruling, would have permitted petitioners, at their option, to cancel the "Lease and Agreement" as modified.↩
4. No contract or other written agreement had ever been entered into with respect to this property prior to the closing. Mr. Cooperman believed he had an oral understanding with Mr. Rutland and Mr. Bussey to close in accordance with the preliminary contract which he had prepared, which had never been signed by a buyer.↩
5. The check payable to the Tamans actually exceeded the amount due them by an amount of $618.17, whereupon they paid by check that amount to the St. Petersburg Bank as trustee. The bank then paid that amount to Mr. Rutland.↩
6. Neither the Trust Agreement dated July 5, 1967, between the St. Petersburg Bank, as trustee, and IMC, as beneficial owner, nor the "Assignment of Beneficial Interest" was recorded in public records. On February 20, 1968, Mr. Rutland directed the bank to convey to him the Walgreen Building, which the bank did by a deed dated April 21, 1968.↩
7. SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT. (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind.--No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. (b) Gain From Exchanges Not Solely in Kind.--If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.↩
8. In Coastal Terminals, Inc. v. United States, 320 F.2d 333 (4th Cir. 1963), the Court, after reciting that section 1031 is inapplicable where a sale is made for money and the money reinvested immediately in other property, concluded on facts similar to those here present that the transactions did constitute an exchange of like kind properties. In Trenton Cotton Oil Co. v. Commissioner, 147 F.2d 33 (6th Cir. 1945), reversing on other grounds a Memorandum Opinion of this Court, the Court held that a sale of property with the proceeds therein immediately reinvested in like property did not constitute an exchange of properties of like kind. The properties involved in the Trenton Cotton Oil Co↩. case were commodity futures contracts.
9. This quoted statement is the only indication in respondent's brief that he might be contending that the holding of title to the Walgreen Building by the St. Petersburg Bank (if in substance title was held by the St. Petersburg Bank for the beneficial interest of IMC) would not satisfy the requirement that IMC hold title to the property. We do not interpret this language to be such a contention in light of respondent's other arguments. If respondent is contending that the fact that legal title was taken in the name of the St. Petersburg Bank, standing alone, would cause section 1031 to be inapplicable, the argument is clearly without merit. The trust instrument provided in part: The beneficiary or beneficiaries hereunder shall in his, her or their own right have the management of said property and control of the selling, renting and handling thereof, and any beneficiary or his or her agent shall handle the rents thereof and the proceeds of any sales of said property, and the trustee shall not be called upon to do anything in the management or control of said property or in respect to the payment of taxes or assessments or in respect to insurance, litigation or otherwise, except on written direction as hereinabove provided, and after the payment to the trustee of all money necessary to carry out said instructions. No beneficiary hereunder shall have any authority to contract for or in the name of the trustee or to bind the trustee personally. If any property remains in this trust twenty years from this date it shall be sold at public sale by the trustee on reasonable notice, and the proceeds of the sale shall be divided among those who are entitled thereto under this agreement. In our view the substance of the trust was that the St. Petersburg Bank was holding the title as mere nominee for the owner of the beneficial interest. All benefits and burdens of ownership rested with the owner of the beneficial interest. Under these circumstances exchanges of beneficial interests in trusts holding real property as nominees for the parties to the exchange should be treated no differently than a direct exchange of the properties. Trudie T. Munger, 16 B.T.A. 168 (1929). See also, B.B. Margolis, T.C. Memo. 1962-86, 21 TCM 444, 468-469, 471 (1962); and Rev. Rul. 64-220, 1964-2 C.B. 335↩.
10. Respondent has argued that no "exchange" as contemplated by sec. 1031 occurred because the option to sell the land situated in Manatee County provided for a specific dollar amount. However, as pointed out in J.H. Baird Publishing Co., 39 T.C. 608, 618 (1962), sec. 1031↩ presupposes the fixing of values for the properties in an exchange since it contemplates that any exchange may involve "boot." The cases relied upon on this point by respondent are distinguishable. 11. While respondent here relies on Carlton v. United States, 385 F.2d 238 (5th Cir. 1967), the Government apparently conceded in that case that the fact that a transaction is arranged does not cause the provisions of sec. 1031 to be inapplicable. In Carlton, supra, the taxpayers made arrangements to sell ranch lands. The terms of the agreement were amended later to provide for the purchaser to acquire property for purposes of exchange. The taxpayers located suitable property for exchange and made all arrangements with respect to the purchase of the properties to be exchanged in the name of the purchaser of taxpayer's property. However, before any actual transfer of title, it was decided that it was unnecessary to have a duplicate of title transfer so the taxpayers had such property transferred directly to them. The taxpayers then transferred their land for cash, using the cash to buy the property obtained for the purpose of the proposed exchange. As the Court pointed out, it was the alteration of the original plan which brought about the problem presented in that case. The Court stated (385 F.2d at 241): Both parties agree that had the appellants followed the original plan, whereby General would have acquired the legal title to the Lyons and Fernandez properties and then transferred the title to such properties to the appellants for their ranch property, the appellants would have been entitled to postpone the recognition of the gain pursuant to section 1031. However, instead of receiving the title to the Lyons and Fernandez properties from General for their ranch property, the appellants received cash and an assignment of General's contract rights to those properties. Thus, the ultimate question becomes whether the receipt of cash by the appellants upon transferring their ranch property to General transformed the intended exchange into a sale. * * * The Carlton↩ case does not support respondent's position in the instant case, for in the instant case the facts show that IMC did acquire the beneficial interest in the Walgreen Building and then transfer that interest to petitioners.
12. In fact, petitioners conceded that the $61,073.21 which they actually received in their fiscal year 1969 was income since they apparently concluded that this amount was payments received for their fruit as the processor's inventories were sold.↩
8. Whether the existence of an obligation to repay a substantial amount (e.g., as a penalty) in addition to the funds withdrawn might constitute a significant restriction, we do not now decide.↩
13. SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS. (a) Allowance of Deduction. -- (1) General rule.--There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A caritable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate. * * *
(c) Charitable Contribution Defined.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- * * *
(2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.
* * ↩
14. Prior to the Tax Reform Act of 1969, there was no specific provision in the Code covering contributions of partial interests in property. However, sec. 170(f)(3) was added to the Code by the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 556. The year in issue ended June 30, 1968, before the effective date of sec. 170(f)(3)↩.
15. Respondent relies on Rev. Rul. 70-477, 1970-2 C.B. 62↩.
16. 83.01 Unwritten lease tenancy at will; duration Any lease of lands and tenements, or either, made shall be deemed and held to be a tenancy at will unless it shall be in writing signed by the lessor. Such tenancy shall be from year to year, or quarter to quarter, or month to month, or week to week, to be determined by the periods at which the rent is payable. If the rent is payable weekly, then the tenancy shall be from week to week; if payable monthly, then from month to month; if payable quarterly, then from quarter to quarter; if payable yearly, then from year to year. As amended Laws 1967, c. 67-254, sec. 34, eff. June 26, 1967. ↩
17. As stated in 2 Powell on Real Property, par. 256, p. 392 (1975 ed.), "[When,] however, there has been a letting for an undefined period and the tenant goes in possession and there is no reservation of periodic rent, the inference of an estate at will is proper." We note that in Passailaigue v. United States,224 F. Supp. 682 (M.D. Ga. 1963↩), the donee, for a portion of the time it occupied the premises, did so pursuant to an oral lease. The remaining period of occupancy was pursuant to a written lease.The Court held that the taxpayer was entitled to a charitable contribution deduction in the amount of the fair market value of the rent for the entire period the donee occupied the premises.